**JONATHAN GATCLIFFE, Plaintiff,**

**v.**

**JANET RENO, ATTORNEY GENERAL OF THE UNITED STATES, and CHARLES A. KIRK, DISTRICT DIRECTOR, IMMIGRATION AND NATURALIZATION SERVICE, Defendants.**

Case No. 97-149

District Court of the Virgin Islands

Division of St. Thomas and St. John

September 24, 1998

James J. Orlow, Pro Hac Vice, Philadelphia, PA., *for Plaintiff*

Richard S. Davis, St. Thomas., *for Plaintiff*

Toni Florence, Assistant United States Attorney, *for Defendant*

MOORE, *Chief Judge*

### MEMORANDUM

Plaintiff, Jonathan Gatcliffe ["Gatcliffe"], has petitioned this Court for a finding that he is qualified to be naturalized, but for the

pendency of deportation proceedings. For Mr. Gatcliffe to be fully qualified for naturalization this Court must be able to find that he is a man of good moral character after a de novo review under 8 U.S.C. § 1421(c) of the contrary administrative decision under section 1447(a) of the United States Immigration and Naturalization Service ["INS"].[1] The Court held the de novo hearing on Mr. Gatcliffe's application for citizenship on August 13, 1998, and entered its finding from the bench, which this Memorandum and Order supplements. Before the Court reached the issue of good moral character, however, the defendant's motion to dismiss this matter for lack of subject matter jurisdiction was addressed.

Jonathan Gatcliffe is a citizen of Trinidad who entered the United States in 1981 as a legal permanent resident. In 1986 he was convicted in federal court of arson and conspiracy to damage and destroy a building by setting a fire using gasoline, for which he was sentenced to eleven months in prison with five years probation. Later the next year, he was convicted of driving while intoxicated. As a result, in September of 1988, plaintiff's parole was revoked and he spent another thirteen months in federal prison.

In 1989, the INS instituted deportation proceedings, charging plaintiff with deportability for conviction of a crime of moral turpitude. Gatcliffe filed a motion to terminate the deportation proceedings, which was granted after the INS failed to respond. In July 1993 plaintiff filed an application for citizenship, the N-400, which was denied in September of that year. In March 1994, deportation proceedings again commenced. While these administrative proceedings were pending, plaintiff filed a second application for citizenship. The Assistant District Director of INS (on the recommendation of Francisco Soto, District Adjudication Officer) denied the new application in October 1996 and was affirmed by

---

[1] Section 1421(c) provides:

A person whose application for naturalization under this subchapter is denied, after a hearing before an immigration officer under section 1447(a) of this Title, may seek review of such denial before the United States district court for the district in which such person resides in accordance with chapter 7 of Title 5. Such review shall be de novo, and the court shall make its own findings of fact and conclusions of law and shall, at the request of the petitioner, conduct a hearing de novo on the application.

8 U.S.C. § 1421(c).

the District Director on May 27, 1997, after a hearing under 8 U.S.C. 1447(a). It is this denial which is before the Court.

**The Motion to Dismiss**

The Government has moved to dismiss these proceedings pursuant to section 1429, which provides for purposes of this action that

> no person shall be naturalized against whom there is outstanding a final finding of deportability pursuant to a warrant of arrest issued under the provisions of this chapter or any other Act; and no application for naturalization shall be considered by the Attorney General if there is pending against the applicant a removal proceeding pursuant to a warrant of arrest issued under the provisions of this chapter or any other Act: Provided, That the findings of the Attorney General in terminating removal proceedings or in canceling the removal of an alien pursuant to the provisions of this chapter, shall not be deemed binding in any way upon the Attorney General with respect to the question of whether such person has established his eligibility for naturalization as required by this subchapter.

8 U.S.C. § 1429. The Government takes the position that section 1429 divests this Court of the jurisdiction it would otherwise possess under section 1421(c). The Government argues that its interpretation would prevent a "race to naturalization," an attempt by a petitioner to be naturalized before the INS is capable of completing deportation proceedings. The Court notes that the Government here takes a contrary position from the concession made in *Dominguez v. Smith*, 18 Immig. Rptr. A3-69 (E.D. Wa. January 26, 1998) ("Defendants departed from their briefing and conceded that [section 1429] does not prohibit de novo judicial review of the Plaintiff's naturalization petition.") The Eastern District of Washington there granted de novo review under section 1421(c).

What Gatcliffe seeks to do here is perfectly compatible with section 1429. Plaintiff is simply seeking to have the Court clear the

way for him to be able to move to have the Attorney General (INS) terminate the removal proceedings pending against him. Indeed, termination of removal proceedings is specifically mention in section 1429. In fact, under case authority, plaintiff is required to establish through a court finding his prima facie eligibility for naturalization but for the pendency of removal proceedings. *See, e.g., Matter of Cruz*, 15 I&N 236 (BIA 1975). De novo review via section 1421(c) is certainly an appropriate method for obtaining such a court decision. The INS has conceded that Gatcliffe is otherwise eligible to be naturalized but for its administrative finding that he is not of good moral character and the pendency of removal proceedings. If this Court finds him to be of good moral character, he has established prima facie eligibility for naturalization but for the deportation proceedings and can move to terminate the deportation/removal proceedings. If the Attorney General grants the motion to terminate, section 1429 will no longer bar consideration of Gatcliffe's application for naturalization.

Thus, there is no race to naturalization. Section 1421(c) merely provides for judicial review of an administrative INS decision. Since the review is de novo, the Court makes its own findings on whether petitioner is of good moral character based on this community's mores. None of this will interfere with, much less usurp, the Attorney General's statutory authority to evaluate and grant plaintiff's application for citizenship.

**Petition For Finding That Plaintiff Is Fully Qualified to Be Naturalized But For The Pendency of Deportation Proceedings**

To show that he possesses the good moral character necessary to become a naturalized citizen, Mr. Gatcliffe presented numerous witnesses, including family members and unrelated members of this community. In opposition, the Government called the INS officer who recommended that plaintiff be found not of good moral character and testified to the administrative proceedings on plaintiff's petition for naturalization. The evidence established that Gatcliffe was convicted in federal court of arson and conspiracy to damage and destroy a building by setting fire to a building using gasoline in 1986. After serving the initial eleven-month prison term, Gatcliffe was convicted of driving while intoxicated. As a

result, in September of 1988, his parole was revoked and he spent another thirteen months in federal prison.

It was in this second term of imprisonment, according to the convincing testimony of his mother, that plaintiff's rehabilitation began in earnest. Upon his release, he lived for a while with his family, for the first time forming strong family bonds. He ultimately moved to St. Thomas in 1991, began a business as a fisherman, and was married six years ago. Since that time, by all accounts, he has grown to be an integral part of the St. Thomas community. The unrebutted and unanimous testimony was that Mr. Gatcliffe is a good friend and generous to a fault. He donates time, money and the fruits of his labor — fish — to the community.

A number of witnesses testified for the plaintiff.

Sally Lynn, of St. Thomas, sees Mr. Gatcliffe regularly. She recommended him for citizenship without hesitation. Ms. Lynn testified that he has given her fish, has helped her on numerous occasions with car trouble, and assisted her in various and sundry ways. She testified that she knew of his prior convictions and, even considering these, believes that he has reformed and presently is of good moral character.

William Neill, of St. Thomas, testified that Mr. Gatcliffe often catches fish for local residents without much money and gives them the fish to take home to their families. He does not catch just the types of fish sold to restaurants. It often happens that local residents "are waiting around there to find their dinner" when Mr. Gatcliffe arrives on the docks. (Transcript of August 13, 1998 Hearing ["Tr."] at 19.)

Loren Nickbar, a fisherman from St. John, testified that his boat was destroyed in September of 1995 by Hurricane Marilyn, after which plaintiff invited him to fish on his boat and split the catch. Mr. Gatcliffe thus helped support Mr. Nickbar's family for over six months, which "was something beyond the call of friendship to do." (*Id.* at 24.) Mr. Nickbar also testified to plaintiff's popularity within the community for helping out others. "We can't walk through the East End without everyone stopping wanting to say 'hi' to him or him wanting to . . . help someone on a boat . . . . It's a major production to get through town because everyone knows him. Everyone likes him." (*Id.* at 22.)

427

Bezzle Ghent, the former curator of Coral World marine exhibit on St. Thomas before Hurricane Marilyn, testified that Mr. Gatcliffe donated quantities of fish to Coral World, both as display specimens and as food for the specimens in the shark tank. When asked whether Mr. Gatcliffe "makes any contribution to the community on the East End," he responded that "on a daily basis when his boat comes in over at Sapphire [Beach Hotel], all the maids are there waiting for free fish. He gives it to them." (*Id.* at 29.) Gatcliffe also invited Mr. Ghent to fish with him following Hurricane Marilyn to help support himself, despite the fact that plaintiff did not need help on the boat.

Cecilia Brunant, a travel agent on St. Thomas, sees plaintiff six days a week and is "like a mother to him." (*Id.* at 32.) She testified that he is a hard working, honest, trustworthy young man. "I sometimes think he works too much . . . ." (*Id.*)

> He makes a contribution to the East End . . . . He goes fishing and it's there they have some people that will come. He just would give them fish and whatnot . . . . And they don't pay him and he doesn't worry about that. But sometimes he loans money, not that he's a rich guy, he loans his money. And I don't think they pay him back, but he will loan money for that.

(*Id.* at 33.)

Andy John LaPlace, of St. Thomas, testified to the same. When asked how Mr. Gatcliffe is regarded in the community, he responded that to his knowledge "he is respected. He's known as a good, honest person, [a] hard worker." (*Id.*at 36.)

Pamela June Cantello, of Ft. Lauderdale, Florida, the plaintiff's mother-in-law, testified that he is "honest and has the utmost integrity and is a very kind person and a very loyal friend." *Id.* at 40. She added that she was unconcerned when her daughter moved with a convicted felon to the Virgin Islands. "I knew she'd chosen a good person who would take care of her and she's proven me right over the years." (*Id.* at 39.) She thinks of the plaintiff not as a son-in-law, but as a son.

Eva Gatcliffe, of Boca Raton, Florida, a mother of eight, including the plaintiff, testified that jail was the "best thing that ever

happened to [her] son." (*Id*. at 43.) "He became a different person." (*Id*.at 44.) She discussed his rehabilitation in prison and stated that his good moral character developed during and continued after his second stint in jail.

Finally, Wendy Gatcliffe, of St. Thomas, plaintiff's wife, testified how generous he is with the people of the community. She related that she has to "constantly keep him from being overly generous. He . . . gives so much away: time, fish, money." (*Id*. at 46-47.) It appears that even during the hard times following the hurricane, he would still give money away. (*Id*.) She testified about a discussion the two held in which Mr. Gatcliffe discussed his conviction.

> [W]hen he explained to me what he did and how awful everything was, the thing that he was most upset about was not the fact that he had spent time in jail or that he got caught. It was that he was so regretful that he put his family through all of this.

(*Id*. at 49.)

Despite such glowing reports, Mr. Gatcliffe has had no success in convincing the INS of his rehabilitated good moral character. As discussed earlier, the District Director's decision upholding a finding that plaintiff lacked good moral character is what this Court is reviewing de novo. The Government presented only the INS officer most involved in plaintiff's case, Francisco Soto, District Adjudication Officer, who testified to the administrative record. On cross-examination, Officer Soto conceded that, except for good moral character, Mr. Gatcliffe meets all eligibility requirements (residency, physical presence, command of English, civics and U.S. history, and "attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States." 8 U.S.C. § 1427.). Officer Soto even agreed that the only factor taken into consideration in finding that Gatcliffe was not of good moral character was the existence of the two convictions, both of which predate the five-year cutoff for good moral character required by section 1427(a)(3).[2] Rehabilita-

---

[2] Section 1427(a), "Residence," provides, in part:

tion was not considered because plaintiff was going to be deported anyway. The Court thus has no evidence to rebut plaintiff's showing of good moral character during the statutory period.

Analysis

While section 1427(a)(3) refers only to showing good moral character during the statutorily prescribed period, section 1427(e) provides that "the Attorney General shall not be limited to the applicant's conduct during the five years preceding the filing of the application, but may take into consideration as a basis for such determination the applicant's conduct and acts at any time prior to that period." There is extensive authority, however, that it is impermissible to rely solely on acts outside the statutory period. *See, e.g., Marcantonio v. Immigration and Naturalization Service*, 185 F.2d 934 (4th Cir. 1950); *Tan v. United States Department of Justice, Immigration and Naturalization Service*, 931 F. Supp. 725 (D. Hi. 1996). Such acts must be considered together with any rehabilitation which occurred afterward.[3]

It was thus improper for the INS to deny Gatcliffe's naturalization based solely on his convictions outside the five-year statutory period.

Conclusions of Law

Section 1429 does not prevent this Court from conducting a de novo review under section 1421(c). *See, e.g., Matter of Cruz*, 15 I&N 236. The INS improperly relied solely on acts outside the statutory period. *See, e.g., Marcantonio v. Immigration and Naturalization*

---

No person . . . shall be naturalized unless such applicant, (1) immediately preceding the date of filing his application for naturalization has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least five years and during the five years immediately preceding the date of filing his application has been physically present therein for ·periods totaling at least half of that time . . ., and (3) during all the period referred to in this subsection has been and still is a person of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States.

8 U.S.C. § 1427(a).

[3] The mandate of the 1990 amendments to the Immigration and Nationality Act, INA § 101(f)(8), 8 U.S.C. § 110(f)(8), that any person found to have committed an aggravated felony can not be found to be of good moral character applies only to aggravated felonies committed after November 29, 1990. INS General Counsel Opinion 96-16.

430

*Service,* 185 F.2d 934; *Tan v. United States Department of Justice Immigration and Naturalization Service,* 931 F. Supp. 725.

Findings of Fact

The Court finds that the plaintiff has shown by a preponderance of the evidence that he is of good moral character. The Court also finds that, but for the pendency of the deportation proceedings, Jonathan Gatcliffe is fully qualified for naturalization. The decision of the District Director of the Immigration & Naturalization Service of May 27, 1997, is reversed and the matter is remanded for further proceedings.

ENTERED this 24th day of September, 1998.

### ORDER

For the reasons set forth in the foregoing Memorandum, it is hereby

ORDERED that the Government's Motion to Dismiss is DENIED; and it is further

ORDERED that Jonathan Gatcliffe is found to be of good moral character. The Court finds that but for the pendency of the deportation proceedings, Mr. Gatcliffe is fully qualified for naturalization. The decision of the District Director of the Immigration & Naturalization Service of May 27, 1997, is REVERSED and the matter is REMANDED for further proceedings.

ENTERED this 24th day of September, 1998.